## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| WHIPPS, INC., <br>     Plaintiff, <br><br> v. <br><br> ROSS VALVE MANUFACTURING COMPANY, INC. , <br> ROSS-WHIPPS GATE COMPANY and <br> CLYVE GAMBLE, <br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | CIVIL ACTION <br> No. 14-40045-TSH |

### MEMORANDUM AND ORDER ON PLAINTIFF WHIPP'S, INC. MOTION FOR PRELIMINARY INJUNCTION (Docket No. 2)
### May 8, 2014

**HILLMAN, D.J.**

### Background

Whipps, Inc. ("Whipps") has filed a Complaint against Ross Valve Manufacturing Company Inc. ("Ross Valve"), Ross-Whipps Gate Company ("Ross-Whipps") and Clyve Gamble ("Gamble") seeking relief for: Federal Trademark Infringement, in violation of 15 U.S.C. §1114 (Count I); Unfair Competition and False Designation of Origin, in violation of 15 U.S.C. §1125(a)(Count II); Misappropriation of Confidential Information and Trade Secrets, in violation of Mass.Gen. L. ch. 93, §42, the Massachusetts common law of misappropriation and the New York common law of Misappropriation (Count III); Misappropriation of Confidential

Information and Trade Secrets in violation of the Uniform Trade Secrets Act (Count IV)[1]; and violation of the Massachusetts Consumer Protection Act (Count V) . This Memorandum and Order addresses Plaintiff Whipps, Inc. Mot. For Prel. Inj. (Docket No. 2).

## **Standard of Review**

It is well-settled law that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Voice Of The Arab World, Inc. v. MDTV Medical News Now*, *Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). While all four factors must be weighed, the moving party's likelihood of success on the merits is "the touchstone of the preliminary injunction inquiry." *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998). "[I]f the moving party *cannot* demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Maine Educ. Ass'n*, 695 F.3d at 152 (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)) (emphasis added). Furthermore, the importance of whether the movant is likely to succeed on the merits "is magnified in trademark cases because the resolution of the other three factors will depend in large part on whether the movant is likely to succeed in establishing infringement." *Borinquen Biscuit Corp.*, 443 F.3d at 115.

The moving party bears the burden of proof for each of these four factors. *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). Where all parties agree as to the

---

[1] In their opposition, Defendants argue that Count IV should be dismissed because Massachusetts has not adopted the Uniform Trade Secrets Act. This may well be the case. However, a passing reference in an opposition memorandum is not the mechanism for dismissing a claim. If Defendants feel that there is no legal basis to support any of Plaintiff's alleged claims (or if there is agreement that Massachusetts hasn't adopted the Uniform Trade Secrets Act), they should file the appropriate motion.

basic facts of a dispute, a court "is free to accept as true well-pleaded allegations in the complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction." *Avaya v. Ali*, Civ.Act. No. 12-10660-DJC, 2012 WL 2888474 (D.Mass. Jul. 13, 2012) (citing *Rohm & Haas Elec. Materials, LLC* v. Elec. Circuits Supplies, Inc.*,* 759 F.Supp.2d 110, 114 n. 2 (D.Mass. 2010)) (internal quotations omitted). However, where there is significant dispute as to the underlying facts, "the propriety of injunctive relief hinges on determinations of credibility." *Id.* (internal quotations omitted).

## Facts

### *Trademark Infringement*

George Whipps ("George") and his wife Pauline founded Whipps in 1977. Since then, George has run the company as its president at its headquarters in Athol, Massachusetts. Whipps is a leading manufacturer of metal water control gates for the water/wastewater treatment industry. Since its inception, Whipps has cultivated a reputation for innovation and quality. George has been involved with the invention and registration of seven industry patents and wrote a key industry standard for the manufacture of stainless steel water control gates.

In January 2011, Whipps obtained federal trademark registration of the name, "Whipps, Inc." on the Principal Register of the United States Patent and Trademark Office (Registration No. 3,906,212), pursuant to Section 2(f) of the Lanham Act (the "Whipps Mark"). The Whipps Mark has been applied to the manufacturing and sale of metal slide gates for controlling fluid flow through a passageway or channel and consists of standard characters-- no claim is made to any particular font, style, size of color, or to the use of "Inc." apart from its use with Whipps.

The trademark was at all relevant times in effect and in good standing and used in interstate commerce.

Whipps advertises on its website and occasionally in trade publications. Whipps also attends industry trade shows and in recent years has sponsored a booth at the Water Environment Federation's Annual Technical Exhibition and Conference ("WEF Conference")—the largest annual water quality exhibition in the United States. Whipps also maintains exclusive marketing agreements with independent sales representatives who market its product throughout the United States and Canada. As a result of the company's reputation and efforts to market its products (both by traditional means and through relationships with independent sales representatives), Whipps has substantial market presence and name recognition within the water control gate industry not only in the United States and Canada, but throughout the world. Whipps has sold tens of thousands of gates across North America and internationally, including water control gates for treatment plants of major cities such as New York, Chicago, Los Angeles and Dallas. Whipps has continually used the "Whipps, Inc." name on its products since 1977.

Ross Valve is a corporation located in Troy, New York that, according to its website, manufactures "an extensive line of automatic control valves for treated and untreated water, in a variety of actuation methods, for a wide range of applications." In late 2013, Ross Valve hired two Whipps senior management employees—Evan Whipps ("Evan") and Gamble--to run a new company division known as "Ross-Whipps Gate Company" to directly compete with Whipps in the metal water control gate industry. Both Evan (who is George's son) and Gamble were employed as senior managers of Whipps when it obtained its federal trademark in 2011.

Prior to going to work for Ross-Whipps, Evan worked for Whipps, as Regional Sales Manager from June 1989-1997; in 1997, he left Whipps and went to work with Vulcan Industries ("Vulcan") as Sales Manager (Vulcan sold equipment to the same water and wastewater industry as Whipps, but their primary focus was on products other than water control gates). In 2007, he returned to Whipps where he worked as Executive Vice President until August 2013.

Evan left Whipps in August 2013 because he felt his father had reneged on an oral promise made to get him to return to Whipps (Evan represents that his father promised to give him the right to all voting shares in the company). Whipps then established Ross-Whipps with Andrew Ross and William Ross. Ross-Whipps advertises, manufactures, fabricates and produces water control products, including water control gates and related equipment. Evan is listed as a "principal" of Ross-Whipps, although it is not clear that he holds any stock in the company. Since opening, Ross-Whipps has caused two of Whipps' independent sales representatives (with whom Evan worked closely when employed at Whipps as Executive Vice President) to terminate their relationship with Whipps and begin marketing Ross-Whipps' products.

In or about February 2014, Jacquet Northeast ("Jacquet"), which supplies steel gates to Whipps, received an inquiry from Ross-Whipps regarding a price quote. One of Jacquet's employees directed the inquiry to the sales representative who covers the Whipps' account. On March 11, 2014, Whipps sent a demand letter to Ross Valve and Ross-Whipps notifying those entities of the existence of the "Whipps, Inc." trademark and requesting that those entities cease and desist from infringing upon the federally registered mark. Whipps put the corporate Defendants on notice of its intention to assert its rights if those companies continued to violate

the mark. The certified mail return receipt cards show that Ross Valve received the letters on March 12, 2014. To date no response has been received by or on behalf of Whipps.

### *Theft of Trade Secrets*

In the summer of 2013, George conceived of a unique, proprietary design for an industry-first application of a manufacturing process know as a "self-jigging" gate—more specifically, applying the self-jigging, slot and tab process to the manufacture of heavy metal gates. The process affords Whipps numerous benefits including reduced labor time, reduced manufacturing costs, production uniformity and efficiency. Whipps anticipates that upon full implementation of this process, it will achieve a substantial competitive advantage by combining its longstanding reputation for high quality products with lower manufacturing costs.

As Whipps' Director of Engineering, Gamble was a senior-management level employee in a position of trust and confidence at Whipps. He was one of the senior managers who met with the president of the company to discuss confidential business matters including budgets, customer solicitations, production, bidding and pricing, design and manufacturing of new products, and the overall strategic plan for the business. As Director of Engineering, he oversaw all engineering employees and was responsible for the oversight of new projects such as the self-jigging gate process. In June 2013, George approached Gamble with his concept for the self-jigging process to be used in the manufacture of water control gates because Gamble was his most experienced engineer, and as Director of Engineering Gamble would oversee the assignment of the task to prepare the drawings that would accompany the patent application that George told Gamble he expected to submit.

In a July 2013 email to Whipps' patent attorney, Mark Pandiscio, George referred to his concept and informed counsel of his intention to seek a patent. George copied Gamble on the email. As the Director of Engineering, Gamble was clearly aware of the importance of maintaining the confidentiality of a unique process that was being considered for patenting. Gamble resisted George's efforts to develop this process and continually delayed assigning the task of creating the engineering design that needed to be submitted with the patent application. Indeed, Gamble belittled the process George proposed to patent. By the time Gamble left Whipps' employment in early December 2013, the design plans for the process had still not been completed by Gamble's staff.

Gamble cited a desire to take time off from the industry due to stress-related health concerns when he gave his resignation notice to George. Ross-Whipps hired Gamble shortly after his resignation from Whipps. Almost immediately thereafter, Ross-Whipps manufactured and exhibited on its website a metal slide gate product that appears to be produced using the same self-jigging welding process that George conceived and which Gamble had delayed implementing while at Whipps. Gamble had not signed a confidentiality or non-competition agreement.

## Discussion

In support of their relative positions regarding Whipps' motion for a preliminary injunction, the parties relied on the testimony of Gamble and Richard Scott, affidavits, exhibits and argument/proffer of counsel.

7

*Trademark Infringement*

A trademark includes any word, name, symbol or device or combination thereof used by a person to identify and distinguish his or her goods from those manufactured or sold by others and to indicate the source of the goods. *See* 15 U.S.C. § 1127. To establish a claim of trademark infringement, the plaintiff must demonstrate that: (1) its mark merits protection, and (2) the allegedly infringing use is likely to result in consumer confusion. *See Borinquen Biscuit Corp. v. M.V. Trading Corp.,* 443 F.3d 112, 116 (1st Cir. 2006). The plaintiff must establish more than a theoretical possibility of confusion. *See Boston Duck Tours, LP v. Super Duck Tours LLC,* 531 F.3d 1, 12 (1st Cir. 2008).

There is a "spectrum of distinctiveness," which is used for purposes of determining whether a mark is entitled to trademark protection, "[a]t one end are generic terms. In the middle are descriptive terms, which can be protected only if they have acquired a 'secondary meaning' by which consumers associate it with a particular producer or source. At the far end are suggestive, arbitrary and fanciful terms, known has 'inherently distinctive' terms, requiring no proof of secondary meaning". *Donoghue v. IBC/USA (Publications), Inc.,* 886 F.Supp 947, 952 (D.Mass. 1995)(internal citations and citation to quoted case omitted). Where the trademark is a surname, the mark is considered "'inherently indistinctive, i.e., weak'" and will be "'permitted trademark protection only upon a showing that have become strong marks by acquiring distinctiveness through secondary meaning.'" *Id.* (citation to quoted case omitted).

The Lanham Act expressly provides for the registration of trademarks that have acquired "secondary meaning" in the market. *See* 15 U.S.C. § 1052(f). "Secondary meaning exists if in fact a substantial number of present or prospective customers understand the designation when

used in connection with a business to refer to a particular person or business enterprise." *Food Fair Stores, Inc. v. Lakeland Grocery Corp.*, 301 F.2d 156, 160-61 (4th Cir. 1962). Furthermore,

> A certificate of registration of a mark upon the principal register … shall be prima facie evidence of the validity of the registered mark and of the registration, of the owner's ownership of the mark, and of owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions and limitations stated in the certificate.

15 U.S.C. § 1057(b).

As to whether the Whipps Mark has attained secondary meaning within the relevant customer base:

> 'Secondary meaning grows out of long association of the [personal] name with the business, and thereby becomes the name of the business as such; is acquired when the name and the business become synonymous in the public mind; and submerges the primary meaning of the name as a word identifying a person, in favor of its meaning as a word identifying that business.'
>
> ….
>
> 'Proof of secondary meaning entails vigorous evidentiary requirements.' The plaintiff must not only show that it used a personal name as a trademark, but that a 'substantial portion of the consuming public associates [the name] specifically with [its] business.' Furthermore, the plaintiff must show that these consumers base purchasing decisions upon seeing the trademark (i.e. the personal name) on the product:
>
>> To acquire a secondary meaning in the minds of the buying public, a labelled [sic] product, when shown to a prospective customer, must prompt the reaction, 'That is the product I want because I know that all products with that label come from a single source and have the same level of quality.' In other words, the article must proclaim its identity of source and quality, and not serve simply to stimulate further enquiry about it.

*Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 20 (1st Cir. 2004)(citation to quoted authorities and internal citations omitted).

Absent direct evidence of secondary meaning, such as consumer surveys or testimony, in order to determine if a trademark has acquired secondary meaning, i.e., is a mark the public associates with coming from a particular source, the Court applies the following factors:

> (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture.

*Donoghue*, 886 F.Supp. at 952-53 (citation to quoted case omitted).

The Whipps Mark has been registered since 2012 and, therefore, Whipps is entitled to a presumption that it was distinctive at the time that Ross-Whipps came into existence. The presumption can be rebutted if Ross-Whipps proves, by a preponderance of the evidence, that the Whipps Mark is merely descriptive. The burden would then shift back to Whipps to prove that its mark has established secondary meaning. *Bay State Sav. Bank v. Baystate Financial Services, LLC*, 484 F.Supp.2d 205, 213 (D.Mass. 2007). Furthermore, "where the PTO registers a mark without requiring the applicant to prove secondary meaning, the registrant is entitled 'to a presumption that its registered trademark is inherently distinctive, as opposed to merely descriptive.' However, when the PTO registers a mark only after requiring an applicant to prove secondary meaning , the holder is entitled to a presumption that the mark is valid because it has acquired secondary meaning." *Id.* There is no evidence on the record as to the circumstances surrounding the registration of the Whipps Mark and therefore, the Court will assume that it is entitled to a presumption that it is inherently distinctive-- as opposed to that it is valid because it has attained secondary meaning. I find that Defendants have failed to rebut the

presumption and therefore, Whipps has established that its mark has established secondary meaning.

For the sake of completeness, I will examine whether Whipps has established that its mark has attained secondary meaning applying the aforementioned factors: (1) although the Whipps Mark has been registered for less than two years, it has been in constant use in the water gate control industry since 1977; (2) Whipps promotes and advertises its mark on its website, and occasionally in trade publications and through trade shows, including its sponsorship of a booth at the WEF Conference. Whipps also maintains exclusive marketing agreements with independent sales representatives who market its product throughout the United States and Canada; and (3) Whipps has consciously created a link between its products and the Whipps name in order to promote recognition in the water gate control industry. Under these circumstances, I find that Whipps has established that its mark has achieved secondary meaning—that is, that a substantial portion of the relevant consumer industry attributes "Whipps" specifically with Plaintiff's business. Having found that the Whipps Mark is eligible for trademark protection, I will now examine whether Plaintiff has established a likelihood of confusion.

For purposes of evaluating whether the allegedly infringing conduct creates a likelihood of confusion, the Court considers the following eight factors:

> [1] the similarity of the marks; [2] the similarity of the goods; [3] the relationship between the parties' channels of trade; [4] the relationship between the parties' advertising; [5] the classes of prospective purchasers; [6] evidence of actual confusion; [7] the defendant's intent in adopting its mark; [8] and the strength of the plaintiff's mark.

*Astra Pharm. Prods. Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir. 1983). "A proper analysis takes cognizance of all eight factors but assigns no single factor dispositive weight." *Borinquen Biscuit*, 443 F.3d at 120.

*Similarity of the Marks and Goods*

When examining the similarity of two marks, the Court should consider "the total effect of the designation, rather than a comparison of individual features." *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482. 487 (1st Cir. 1981). "Specifically, the Court looks to the total effect, examining the similarity in 'sound, appearance, and meaning.' When evaluating marks containing words, the type of letters used (script or block), the color and composition of the background upon which they appear, and the spelling of the words, are important considerations." *Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc.*, CIV.A. 10-10742-DJC, 2011 WL 6812642 (D. Mass. Dec. 28, 2011).

Admittedly, there are significant differences in the appearance of the parties' marks: "Ross-Whipps" generally consists of "Ross" in black and "Whipps" in bright red on a white background while "Whipps, Inc." appears in a light color (either white or grayish) on a dark green background and the fonts are not identical. At the same time, due to the color schemes, "Whipps" stands out and is the dominant feature of each of the marks. The parties' are selling the same goods, metal water control gates.

*The relationship Between the Parties' Channels of Trade and Advertising and the Parties' Respective Customer Base.*

The parties both target the same customer base, primarily municipalities, and advertise and sell their products in similar manners—which is not surprising since Evan was the head of sales while at Whipps. For example, the parties participate in trade shows and sponsor booths at

the industries' largest trade show, the WEF Conference. Furthermore, at least two of Plaintiff's independent sales representatives have terminated their relationship with it and are now marketing for Ross-Whipps.

*Ross-Whipps' Intent*

While there is no direct evidence of Ross-Whipps' intent, the Court finds that it is clear from the record that when choosing a name for their new division, Andrew and William Ross adopted the use of "Whipps" in the company's name to take advantage of the name recognition and good will associated with the Whipps' name in the water control gate industry. Therefore, the Court finds that Ross-Whips has acted in bad faith.

*The Strength of the Mark*

Whipps is a leading manufacturer of metal water control gates for the water/wastewater treatment industry. Whipps has a reputation for innovation and quality and is one of the leading manufacturers in the industry. George has been involved with the invention and registration of seven industry patents and wrote a key industry standard for the manufacture of stainless steel water control gates. Although the mark has been registered for less than two years, Plaintiff has used the mark since its inception in 1977. Under the circumstances, I find that the mark is strong.

*Actual Confusion*

In February of this year, one of Plaintiff's suppliers, Jacquet, received an inquiry from Ross-Whipps regarding a price quote. One of Jacquet's employees directed the inquiry to the sales representative who covers the Whipps' account, that is, he assumed that the customer was calling on behalf of Whipps.

*Weighing the Factors*

On balance I find that the Whipps has established that there is a likelihood of confusion. I make this finding based on the following: both parties use "Whipps" in a predominate manner in their marks; they sell similar, if not identical products; they advertise and market their products in a similar manner to the same customer base; Ross-Whipps has acted in bad faith in adopting its mark; the Whipps mark is strong; and there has been at least one instance where it appears a supplier has confused the two companies. Therefore, Whipps has established a likelihood of success on the merits. I also find that Whipps has established that that it will be irreparably harmed if the preliminary injunction is not granted and that the equities are in its favor and the public interest favors imposition of injunctive relief. Therefore, Whipps' motion for a preliminary injunction shall be granted as set forth below.

## *Misappropriation of Trade Secrets[2]*

Whipps alleges that Ross-Whipps is using a proprietary manufacturing technique (the "self-jigging gate process") developed by Whipps during Gamble's tenure with the company. More specifically, Whipps alleges that: Gamble oversaw the engineering design for the self-jigging gate process; delayed and discouraged Whipps' preparation of an application to patent the technique; and once he went to work for Ross-Whipps, Gamble shared the design technique for the self-jigging gate with Ross-Whipps, which immediately started to manufacture control gates incorporating the design.

---

[2] Whipps alleges that Defendants have violated Massachusetts and New York law. However, other than a passing reference by Whipps to New York law, both parties citer primarily to and focus their arguments on Massachusetts law. Because the parties have not addressed the choice of law issue, the Court will also assume that Massachusetts law applies.

14

Ross-Whipps cannot seriously contest that under Gamble's direction, it is utilizing the self-jigging gate technique which was being developed by Whipps at the time that he left its employ. Instead, Defendants argue that Whipps made no attempt to ensure that the information was kept confidential. Defendants also make the somewhat circuitous argument that the self-jiggle gate technique is based on a well-known design utilized in other disciplines and since Gamble was aware of the other uses of the self-jiggle design, "he can't unlearn what he previously learned."

"To prevail on a claim of misappropriation of trade secrets, a plaintiff must show: 1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret."[3] *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007) In this case, I find as a matter of law that the third prong is satisfied. I so find because Gamble admitted the hearing that he was in touch with Evan/Ross-Whipps prior to leaving Whipps' employ and it is clear to the Court that Ross-Whipps adopted the self-jigging gate design being developed at Whipps prior to Gamble's departure[4]. Such conduct *at the very least* constitutes a bad faith breach of a confidential relationship by the Defendants to acquire and use the Whipps' design technique. Defendants seeming bad faith is also reflected in the fact that on the record

---

[3] Whipps has also asserted a claim for violation of Mass.Gen.L. ch. 93, §42 (misappropriation of trade secrets). Because the statutory and common law claims are essentially equivalent, *see Incase, Inc.*, 488 F.3d at 52 n.10, the Court will address the two claims together.

[4] "Under Massachusetts trade secret law, a third party who knowingly benefits from a trade secret which a person in a confidential relationship obtained from the plaintiff is liable to the plaintiff for the misappropriation of that trade secret." *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 795 F.Supp. 501, 507 (D.Mass. 1992). Therefore, Ross-Whipps may be liable regardless of the fact that it was Gamble who took the trade secret from Whipps.

before me, there is evidence that Gamble delayed the development of the design while at Whipps.[5]

I will now examine whether Whipps has established that the self-jigging gate technique is a trade secret and whether Whipps took reasonable steps to preserve its secrecy. "Under Massachusetts law, a trade secret is a 1) 'secret,' that is 2) 'used in one's business,' and that 3) 'gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use' the secret. 'A trade secret may consist of any formula, pattern, device or compilation of information' ... 'The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.' *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F.Supp.2d 217, 238-39 (D. Mass. 2011)(internal citations and citation to quoted cases omitted).

It is a close call as to whether the self-jigging gate process is a trade secret. In this case, while Whipps had developed a concept for a self-jigging control gate, it had not completed written design plans. Had They done so, I would have no problem finding that the drawings containing such design are trade secrets, *see DB Riley, Inc. v. AB Engineering Corp.*, 977 F.Supp. 84 (D. Mass. 1997). The question thus becomes whether George had provided a sufficiently detailed description of the design and specification of his self-jigging gate concept sufficient to constitute a trade secret. Based on the detailed description provided in George's Affidavit, which he shared with a limited number of employees, including Gamble and,

---

[5] At the hearing, Gamble testified that he was not responsible for overseeing the design—that is, it was not his responsibility to make sure that his subordinates were working on the design and for preparing an application to the patent office—rather George had gone directly to two other engineers and asked them to prepare the design. The benefit of having live witnesses in these types of proceedings is that the Court is able to access credibility. Unfortunately for the Defendants, I did not find Gamble to be a credible witness. For that reason, I credit very little of his testimony.

significantly, a patent attorney, I find that self-jigging control gate concept constituted a trade secret. Furthermore, based on the testimony and evidence presented at the hearing, I do not find that the self-jigging technique was being utilized in the water control gate industry when Gamble left Whipps.[6] The self-jigging gate design is based on an engineering design apparently well known in other industries. However, I am persuaded that Whipps' design in this case is a trade secret given that it has not previously been used in the water control gate industry.

As to the second element, Gamble was the head of engineering at Whipps. He started at Whipps in 2002 as a project manager, was appointed an engineering manager in about 2004 and was made director of engineering in 2013. He was a member of a small group of executives that met regularly to discuss issues that were matters of importance to the business and were not for public consumption. The industry is a small one, with a few manufacturers competing for the same customer base. It defies credulity to suggest that Gamble did not know of the importance of maintaining the secrecy of designs, particularly innovative designs within the industry. As an

---

[6] Defendants argue that the Fontaine Series 20 gate, which was in the public domain in July 2013, includes the self-jigging technique; in support, Defendants introduced a drawing of the components of the Fontaine Series 20 Gate, *see Ex. C*. It is impossible to tell from the drawing whether this gate includes the slots and tabs which are an integral part of George's design and which *were* included in the Ross-Whipps' gate. Gamble, in a supporting affidavit and at the hearing, testified that the Fontaine Series 20 gate utilized the technique. On the other hand, Whipps presented the testimony of Richard Scott, an independent consultant, who is an engineer that formerly worked for a competitor of Whipps-- Rodney Hunt. Rodney Hunt purchased the Fontaine product line. Scott testified that he observed the manufacture of multiple Fontaine gates and that he did not believe the self-jigging gate design was incorporated into any relevant product line. He further testified that he never saw any manufacturer in the control gate industry, including Fontaine/Rodney-Hunt Fontaine, utilize a slot and tab self-jigging technique. Finally, he testified that he could not tell from the diagram introduced by Defendants (*Ex. C*) whether the Fontaine gate utilized a self jigging design.

   Gamble also testified that in 2007, he designed a water control gate for Whipps, known as a "share gate" which utilized the slot and tab jigging process—he testified that the technique was used in the production of 84 gates and that particular technique is still utilized by Whipps in their Series 703 gates. These gates are "slide gates, " which, although water control gates, are different from the gates at issue in this case. In any event, I do not find Gamble's testimony on this issue persuasive.

executive at the company, it was incumbent on Gamble to respect the confidential nature of such sensitive information.[7]

For the reasons set forth above, I find that Whipps is likely to succeed on the merits of its claim for misappropriation of trade secret. I further find that Whipps has established it will be irreparably harmed if a the preliminary injunction does not enter, that the equities and public policy favor entry of such an injunction. Therefore, a preliminary injunction shall enter in favor of Whipps as set forth below.

### Terms Of Preliminary Injunction

1. Ross Valve Manufacturing Company, Inc., Ross-Whipps Gate Company, and their respective parent companies, subsidiaries, sister companies, agents, sales representatives, servants, employees, officers, directors, successors, attorneys, licensees, assignees, and all related persons or entities, be preliminarily enjoined ***until further order of this Court*** from:

  a. using the Whipps trademark in trade or commerce;

  b. using in any form or manner the terms "Whipps" and/or "Ross-Whipps," or any confusingly similar business name, term, trademark, trade name, domain name, email address or internet search keywords or advertisement words, including but not limited to the name Ross Whipps Gate Company and the Rosswhipps.com domain.

  c. engaging in any conduct which will cause or is likely to cause confusion, mistake or misunderstanding as to the source, affiliation, connection, or association of Ross Valve Manufacturing Company, Inc. and/or Ross-Whipps Gate Company, and/or their products, promotions, sales or advertisements with Whipps, Inc. or Whipps, Inc.'s products, promotions, sales or advertisements; and

---

[7] "The general rule is that '(i)n situations where there has been no express contract of an employee not to use or disclose confidential information entrusted to him during his employment, . . . although an employee may carry away and use general skill or knowledge acquired during the course of his employment, he may be enjoined from using or disclosing confidential information so acquired.' The above stated rule is based upon 'basic principles of equity' and upon an implied contract, growing out of the nature of the employer-employee relationship". *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 839, 282 N.E.2d 921, 924 (1972)(internal citations and citations to quoted cases omitted).

d. otherwise infringing upon Whipps, Inc.'s trademark rights or unfairly competing with Whipps, Inc.

   2. That Ross Valve Manufacturing Company, Inc., Ross-Whipps Gate Company, and their respective parent companies, subsidiaries, sister companies, agents, sales representatives, servants, employees, officers, directors, successors, attorneys, licensees, assignees, and all related persons or entities, be preliminarily enjoined until further order of this Court from:

   a. using or disclosing any Whipps, Inc.'s trade secret information, including but not limited to the self-jigging concept; and

   b. selling or advertising for sale any products designed or manufactured using Whipps, Inc.'s trade secret information, including but not limited to the self-jigging concept.

   3. That Ross Valve Manufacturing Company Inc. and/or Ross-Whipps Gate Company remove all pictures or photographs displaying or referencing Whipps, Inc.'s trade secret information, including but not limited to the image of a water control gate depicting the self-jigging concept, from its website and all other marketing and promotional materials.

   4. That Mr. Gamble be preliminarily enjoined until further order of this Court from:

   a. disclosing or using any Whipps' trade secrets or confidential information, including but not limited to the self-jigging concept; and

   b. engaging in any other conduct that is in violation of his obligations not to use for his own purpose or disclose to anyone else Whipps' trade secrets and confidential information.

## **Security**

This Court's rules of procedure provide in relevant part that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). Therefore, Whipps

shall post a bond or cashier's check in the amount of $50,000 the costs and damages, if any, sustained by any Defendant if found to have been wrongfully enjoined or restrained.

## **Conclusion**

Plaintiff Whipps, Inc. Mot. For Prel. Inj. (Docket No. 2) is ***allowed***, as provided in this Order.

**SO ORDERED**

*/s/ Timothy S. Hillman*
TIMOTHY S. HILLMAN
DISTRICT JUDGE